**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

AUG 2 1 2012

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| **DARNELL JEFFRESS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**CIVIL NO. 3:11-cv-806-HEH**

## REPORT AND RECOMMENDATION

Darnell Jeffress ("Plaintiff") is 33 years old and previously worked as a masonry laborer. He alleges that he suffers from a mental handicap. (Pl.'s Mem. for Summ. J. ("Pl.'s Mem.") at 18.) On July 7, 2009,[1] Plaintiff filed an application for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") payments under the Social Security Act (the "Act") with an alleged onset date of June 29, 2009. (R. at 219-28, 238.) Plaintiff's claim was presented to an administrative law judge ("ALJ") who denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on October 4, 2011. (R. at 1-3.)

Plaintiff now challenges the ALJ's denial of DIB and SSI benefits, asserting that substantial evidence did not support the ALJ's determination that Plaintiff's IQ score was invalid, Plaintiff did not meet Listings 12.05(B), (C) or (D) and Plaintiff was capable of performing his past relevant work as a masonry laborer. (See Pl.'s Mem. at 18-24.) More

---

[1] Plaintiff also filed for DIB and SSI in 2008, but did not pursue the claim after the initial denial of benefits. (R. at 204-216, 316.)

specifically, Plaintiff contends that his IQ score is 51 and he cannot perform any job in the national economy due to his mental impairments. (Pl.'s Mem. at 18-24.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[2] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 8 & 9) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff contests the decision of the ALJ pertaining to his residual functional capacity ("RFC")[3] and, as a result, his mental impairments. (Pl.'s Mem. at 18-24.) Accordingly, Plaintiff's mental maladies and activities of daily living ("ADLs") are summarized below

---

[2] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth) and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

[3] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted.)

## A. Plaintiff's Education and Work History

Plaintiff claimed that he received SSI as a child until he was 18. (R. at 80.) At the time

of his current DIB application, Plaintiff was 30 years old and had completed the 10th grade. (R.

at 219, 268.) He was not placed in special education classes during school. (R. at 268.)

According to school records, he was literate and capable of normal levels of articulation, fluency,

receptive language and expressive language. (R. at 394, 397.) In the sixth grade, Plaintiff

passed the reading, writing and mathematics sections of a Virginia Literacy Testing Program test

with high scores. (R. at 394.) In a 10th grade skills evaluation chart, Plaintiff was rated as

average or above average in 64 of 66 categories derived from testing areas that included reading

comprehension, mathematics and written expression. (R. at 396.) Before he was expelled from

school in the 11th grade, Plaintiff received poor grades and was absent from school a total of 129

days from 1993 through 1997. (R. at 391.)

From 1999 to 2005, Plaintiff reported income from positions with Staffmark, Inc., Harriet

+ Henderson Yarns, Inc., Great Good, Inc., Staffmark East, LLC., Debbie's Staffing Services,

Inc., Temporary Resources, Inc., IH Services, Inc., Industrial Staffing Services, Inc., Busick

Brothers Masonry, Inc. and Pyramid Masonry Contractors, Inc. (R. at 232-33.) Pyramid

Masonry Contractors continued to employ Plaintiff into 2006 as a masonry laborer. (R. at 232.)

Plaintiff's father and sister indicated that Plaintiff was employed by Sara Lee in Winston-Salem,

North Carolina, but that Plaintiff was fired from that position for hitting a co-worker. (R. at 254,

287.)

## B. Plaintiff's Criminal Record

Plaintiff was arrested 13 times between 1997 and 2007 for charges including assault,

theft, cruelty to animals and possession of narcotics. (R. at 260.) From December 2002 to

March 2004, Plaintiff was incarcerated at Botetourt Correctional Center. (R. at 259-60.)

3

Plaintiff's prison records indicated that he was housed in the general population, was not provided any special accommodations and was cited for two separate minor infractions. (R. at 260.) Additionally, Plaintiff did not attend any psychiatric counseling sessions, was not prescribed any anti-psychotic drugs and was never isolated. (R. at 305.)

## C.     Plaintiff's Medical Records

Plaintiff's sole medical record was a March 2009 patient note, when Plaintiff was treated for blood in his urine by Sharon A. Reilly, M.D. (R. at 434-35.) Dr. Reilly opined that Plaintiff's issue was likely caused by trauma following a sexually transmitted disease test. (R. at 434.) Additionally, the record did not contain any patient notes indicating that Plaintiff received any mental health treatment.

## D.     Karen Russell, Psy.D., Virginia Department of Rehabilitative Services Consultative Examiner

On July 17, 2008, Plaintiff was examined by Karen Russell, Psy.D. ("Dr. K. Russell"), a psychologist, in connection with Plaintiff's earlier disability claim. (R. at 402.) At the time of the examination, Plaintiff was 29 years old and living with his father and sister. (R. at 402.) Plaintiff's sister, Charlene Jeffress, took him to his appointment. (R. at 402.) Plaintiff stated during the examination that he did not know why his father had filed his disability claim as he did not believe that he had a problem finding a job. (R. at 402.) Dr. K. Russell was "quite frustrat[ed]" throughout the examination, because neither Plaintiff nor his sister provided much information. (R. at 402-03.)

Ms. Jeffress specified that Plaintiff did not have a history of hallucinations or depression. (R. at 403.) She also indicated that Plaintiff struggled with inter-personal interaction, was verbally threatening and had trouble waiting in line at stores. (R. at 403.) Ms. Jeffress stated that Plaintiff was able to make simple meals for himself, such as a bowl of cereal or canned food,

4

but spent most days watching television and playing video games. (R. at 403.) Ms. Jeffress also noted that Plaintiff had girlfriends. (R. at 403.)

Dr. K. Russell summarized that Plaintiff had a "history of physical fighting, destruction of physical property and lack of remorse." (R. at 403.) Dr. K. Russell asked Plaintiff why he no longer moved bricks in North Carolina and Plaintiff suggested that the cause was his inability to get along with his co-workers. (R. at 403.) Ms. Jeffress indicated that Plaintiff "either walk[ed] out" of jobs or his previous employers told him "to get out." (R. at 403.)

Plaintiff and his sister stated that Plaintiff did not have a history of illegal drug or alcohol use and had never been in trouble with illegal drugs. (R. at 403.) Ms. Jeffress indicated that Plaintiff had seen a therapist at Crossroads, but was unable to answer when or for how long treatment occurred. (R. at 403.) Both Plaintiff and Ms. Jeffress agreed that Plaintiff did not have a history of mental health related hospitalizations. (R. at 403.)

Dr. K. Russell observed that Plaintiff was not fully oriented, but his thoughts were rational and organized. (R. at 404.) Plaintiff was also able to speak clearly at a normal pace. (R. at 404.) Dr. K. Russell noted that Plaintiff did not have any perceptual abnormalities, but did seem defensive and agitated. (R. at 404.) She attempted to administer the Wechsler Adult Intelligence Scale ("WAIS")[4] to Plaintiff but was unsuccessful, because Plaintiff was uncooperative and non-compliant during the evaluation. (R. 402-04.)

Dr. K. Russell opined that Plaintiff "appeared capable of performing simple, routine, repetitive tasks without impairment . . . [and] to understand, retain and follow instructions . . . at a basic level," but would have difficulty relating to co-workers, supervisors and the general

---

[4] The Wechsler Adult Intelligence Scale "is a continuously revised and updated standardized scale for the measurement of general intelligence in adults." LARRY P. TILLEY ET AL., *Stedman's Medical Dictionary* 1596 (27th ed. 2003).

public. (R. at 405.) She diagnosed Plaintiff with Antisocial Personality Disorder and opined that

his diagnosis was the source of Plaintiff's inter-personal work issues. (R. at 405.) Dr. K. Russell

also assigned Plaintiff a Global Assessment of Functioning[5] ("GAF") score of 60.[6] (R. at 405.)

She concluded that Plaintiff was "not psychotic" and did not have "a thought disturbance that

would impact his ability to complete a normal workday." (R. at 406.)

**E.     Frank Russell, Ph.D., Virginia Department of Rehabilitative Services Consultative Examiner**

Dr. Frank Russell, Ph.D. ("Dr. F. Russell"), evaluated Plaintiff on November 30, 2009,

following a request by Disability Determination Services ("DDS"). (R. at 438.) Plaintiff and

Ms. Jeffress arrived late to the evaluation and gave information that contradicted their previous

interview with Dr. K. Russell. (R. at 442, 444.) Dr. F. Russell noted that this examination was

similar to the examination performed by Dr. K. Russell in that it was "very frustrating to get

information," and that Plaintiff and his sister were both vague in answering his questions. (R. at

440.)

Ms. Jeffress told Dr. F. Russell that Plaintiff's mental issues began following a car

accident in which another person in the car had died. (R. at 441.) Ms. Jeffress stated that

Plaintiff had not received treatment by a mental health professional which Dr. F. Russell found

"highly unusual" given Plaintiff's behavior during the examination. (R. at 441.) He asked

Plaintiff if he was right or left handed and Plaintiff appeared to be confused by the question and

---

[5] The Global Assessment of Functioning ("GAF") is a 100-point scale that rates "psychological, social, and occupational functioning." *Diagnostic and Statistical Manual of Mental Disorders*, Americ. Psych. Assoc., 32 (4th Ed. 2002) ("DSM-IV".)

[6] A GAF of 60 is defined as "Moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id.* at 34.

looked to Ms. Jeffress for assistance. (R. at 438.) At one point, Plaintiff began "chanting, 'Ain't going to jail no more, I ain't going. I don't know why I came.'" (R. at 439.)

Ms. Jeffress indicated that Plaintiff did not have any educational problems. (R. at 440.) Dr. F. Russell speculated that if Plaintiff's behavior during the examination was anything like his behavior during his school years, it would have been unlikely that Plaintiff had "ever been able to spend much time at all in a regular education classroom." (R. at 444.) Ms. Jeffress admitted that Plaintiff had three children with the same woman who was potentially Plaintiff's girlfriend. (R. at 440.)

As a result of Plaintiff's tardiness and lack of cooperation, Dr. F. Russell was unable to perform the scheduled WAIS test. (R. at 442-43.) Although he asked Plaintiff to return for further testing, Plaintiff answered that he would not return and indicated that he regretted attending the consultative session. (R. at 442.) Dr. F. Russell was unable to make an evaluation of Plaintiff's functional ability, but observed that Plaintiff's "behavior and demeanor during the evaluation indicat[ed] that he was unable to perform any kind of task[,] maintain any kind of attendance with regard to employment or perform work activities on a consistent basis." (R. at 444.) He opined that Plaintiff had "lifelong difficulties with regard to his behavior and self-control." (R. at 444.) Further, Dr. F. Russell found strong evidence of a personality disorder. (R. at 444.)

Dr. F. Russell watched Plaintiff and Ms. Jeffress when they left the office. (R. at 443.) He observed that, while alone inside a car with his sister, Plaintiff's lips were moving rapidly and he appeared to be "somewhat animated." (R. at 443.) Plaintiff appeared to be smiling or laughing and was gesturing with his hands. (R. at 443.) Dr. F. Russell noted that this kind of affect and gesticulation was not seen during the examination and that, moreover, Plaintiff "did

7

not put more than two sentences together throughout the entire mental status evaluation." (R. at 443.) This observation, combined with the contradictory information provided during Plaintiff's two evaluations, led Dr. F. Russell to conclude that there was "good evidence for an individual malingering" along with a diagnosis of antisocial personality disorder. (R. at 444.)

**F.     Chris Cousins, Ph.D., Plaintiff's Consultative Examiner**

On March 21, 2011, following a request by Plaintiff's counsel, psychologist Chris Cousins, Ph.D., performed a psychological evaluation of Plaintiff. (R. at 459-68.) Ms. Jeffress again accompanied Plaintiff to the evaluation. (R. at 461.) Dr. Cousins noted that Plaintiff was cooperative, but had a difficult time recalling historical information. (R. at 462.) Ms. Jeffress was similarly unable to recall much of Plaintiff's historical information. (R. at 462.) For example, neither Plaintiff nor Ms. Jeffress were able to remember whether Plaintiff attended any special education classes. (R. at 462.) However, Plaintiff was able to recall that he repeated the 9th and 11th grades and that he was "expelled from school in the 11th grade because he threw a dog out of a school window." (R. at 462.)

Dr. Cousins noted that Plaintiff's speech was poor, but understandable. (R. at 461.) Plaintiff displayed difficulty forming responses and often answered vaguely, confusingly or as if he were responding to a different question altogether. (R. at 461.) At the time of the examination, Plaintiff's "hygiene and grooming appeared good." (R. at 461.) Plaintiff stated that he had never been married, but was the father of three children whose ages he could approximate. (R. at 463.)

Plaintiff recalled no inpatient psychiatric hospitalization but claimed that when he was a child, he frequently saw a counselor at Crossroads. (R. at 463.) Plaintiff stated that he only left his home when necessary, had panic attacks and witnessed his cousin die in a car accident. (R. at

463.) Dr. Cousins noted that Plaintiff's statements were "consistent with a diagnosis of Panic Disorder with Agoraphobia." (R. at 463.)

While Plaintiff could not recall when he became unable to work, he indicated that he had anxiety and could not be around people. (R. at 464.) Plaintiff could remember holding one job as a "cement tower" in North Carolina. (R. at 463.) Plaintiff explained that he was fired from this job after a physical altercation with another employee. (R. at 463.) Plaintiff admitted that he had been in jail for the theft of an automobile, was arrested after his mother complained to the police about Plaintiff's tendency to light items on fire and had been in jail on three occasions for fighting. (R. at 463.)

Plaintiff informed Dr. Cousins that he frequently experienced auditory and visual hallucinations. (R. at 464.) Dr. Cousins noted that Plaintiff had been seeing his deceased grandmother since her passing in 2004. (R. at 464.) Dr. Cousins remarked that Plaintiff's thought process was disorganized and that his responses were vague and confusing. (R. at 465.)

Plaintiff stated that he never used illegal drugs, alcohol or tobacco. (R. at 464.) Dr. Cousins recorded that Plaintiff's father and Ms. Jeffress cooked and shopped for Plaintiff. (R. at 464.) Plaintiff conveyed that a normal day for him involved playing video games and feeding dogs. (R. at 464.) Dr. Cousins diagnosed Plaintiff with Panic Disorder with Agoraphobia, Undifferentiated Type Schizophrenia, Mild Mental Retardation and Antisocial Personality Disorder. (R. at 467.) He assigned Plaintiff a GAF score of 35.[7] Dr. Cousins administered the WAIS test and assessed that Plaintiff had a Full Scale IQ of 51. (R. at 468.) He opined that the

---

[7] A GAF of 35 is defined as "some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school)." *DSM-IV* at 34.

9

score placed Plaintiff at the "low end of the mildly retarded range of intellectual functioning." (R. at 468.) Dr. Cousins noted that Plaintiff was able to perform basic daily activities and espoused that Plaintiff could likely perform simple and repetitive tasks if he were properly supervised. (R. at 468.) However, he opined that Plaintiff could not perform complex tasks, maintain regular attendance, consistently perform at work or complete a workday without interruption. (R. at 468.)

**G.      Opinions of Non-Treating State Agency Psychologists**

David Niemeier, Ph.D., a non-treating state agency psychologist, completed a Psychiatric Review Technique ("PRTF") and a Mental RFC Assessment on September 2, 2008. (R. at 410-28.) Dr. Niemeier diagnosed Plaintiff with Antisocial Personality Disorder, and indicated that Plaintiff had a marked limitation in maintaining social functioning, moderate limitations in daily living, maintaining concentration, persistence and pace and had no repeated episodes of decompensation. (R. at 410, 421.)

Dr. Niemeier opined that Plaintiff could perform simple, routine work that involved a stable environment with simple job instructions. (R. at 427.) He summarized that Plaintiff was easily distracted, had a low frustration tolerance and was socially impaired. (R. at 427.) Dr. Niemeier determined that Plaintiff displayed "almost a complete lack of cooperation" during Plaintiff's assessments. (R. at 427.) He suggested that Plaintiff had "some higher level of intelligence than [was] alluded to," as he was capable of concentrating for long periods of time while playing video games and once had a driver's license. (R. at 423.)

Dr. Niemeier completed a second PRTF and Mental RFC Assessment on December 15, 2009. (R. at 317.) In these reports, Dr. Niemeier marked that Plaintiff had mild limitations on daily living and moderate difficulties with social functioning, concentration, persistence and

10

pace. (R. at 317.) Dr. Niemeier again determined that Plaintiff had no repeated episodes of decompensation. (R. at 317.)

On May 14, 2010, Leslie E. Montgomery, Ph.D., a non-treating state agency psychologist, agreed with Dr. Niemeier's assessments of Plaintiff. (R. at 348.) Dr. Montgomery determined that Plaintiff was partially credible and had at most moderate limitations in regard to his understanding, memory, sustained concentration, persistence and adaptation. (R. at 349-51.)

**H.    Cooperative Disability Investigations Unit Reports**

In August 2008, Plaintiff's earlier claim was referred to the Cooperative Disability Investigations Unit ("CDI") of the Richmond DDS as a result of Plaintiff's "Poor Cooperation" and the "Inconsistent Statements" made in connection with Plaintiff's claim. (R. at 258, 303.) An investigator interviewed the owner/manager ("OM") of a local grocery store who had known Plaintiff since Plaintiff was six years old. (R. at 258-59.) The OM stated that Plaintiff shopped at his store alone most of the time, made purchases, provided the correct amount of money and acted appropriately with other customers. (R. at 259.)

Additionally, a confidential witness who had regular contact with the Jeffress family noted that during his interactions with Plaintiff, Plaintiff acted appropriately and conversed normally. (R. at 259.) Similarly, Plaintiff did not receive any special accommodations while incarcerated at Botetourt Correctional Center where he was housed in general population. (R. at 259.)

In November 2009, Plaintiff's current claim was referred to CDI due to possible malingering. (R. at 303.) The CDI report noted that Plaintiff was observed in the passenger's seat of a vehicle and "communicat[ed] with the Driver without difficulty." (R. at 304.) On November 30, a Sergeant with the Mecklenburg County Virginia Sheriff's Office was interviewed and stated that he had observed Plaintiff on a daily basis while Plaintiff was

11

incarcerated and that Plaintiff did not require any special accommodations, did not display any bizarre behavior or mannerisms and did not take any prescription medication. (R. at 305.) Plaintiff was "never housed in isolation, because he did not present, express, or demonstrate activity that constituted a threat to himself or to others." (R. at 305.) According to the Sergeant, Plaintiff did not show any sign of having hallucinations, did not have any comprehension or concentration issues, did not appear to be depressed, had no memory issues and was able to follow instructions and directions without difficulty. (R. at 305.) Additionally, on all three of Plaintiff's inmate screening questionnaires, Plaintiff indicated that he had no mental illness or mental health issues, never attempted suicide, and did not talk in a strange manner. (R. at 305.)

## I.    Additional Evidence

### 1.    Social Security Administration Interviews

Plaintiff was interviewed by a Social Security Administration ("SSA") employee who noted that Plaintiff did not have difficulty with hearing, reading, understanding, concentrating, talking, answering or coherency. (R. at 245.) Further, the employee observed that Plaintiff was "very uncooperative," answered "'I don't know' to a lot of the questions," "seemed to want to be anywhere but" there and "appeared to be mad at the world." (R. at 245.)

Over a year later, Plaintiff was interviewed over the phone by a SSA employee who indicated that Plaintiff did not have difficulty with hearing, reading, understanding, concentrating, talking and coherency. (R. at 262.) However, Plaintiff had difficulty answering and understanding the questions being asked and became upset, after which Ms. Jeffress completed the interview. (R. at 262.)

### 2.    Function Reports

On August 26, 2008, Plaintiff's father, Stanley Harris, completed a Function Report. (R. at 248-55.) Mr. Harris wrote that Plaintiff spent his days eating, feeding his dogs, playing

PlayStation and visiting his mother. (R. at 248.) Mr. Harris noted that Plaintiff "always want[ed] someone else to prepare his food" and that Plaintiff did not "know how to prepare or cook" meals. (R. at 249-50.) The report indicated that Plaintiff needed to be reminded to bathe, brush his teeth and perform other tasks. (R. at 250.) According to Mr. Harris, Plaintiff drove, had trouble getting along with others and attempted to fight friends and family. (R. at 251, 253.) Mr. Harris also wrote that Plaintiff was "very aggressive" and "destroy[ed] a lot of property." (R. at 255.) He indicated that Plaintiff was fired from Sara Lee for punching a man. (R. at 254.)

On August 25, 2009, Ms. Jeffress wrote in a Function Report that Plaintiff spent his days feeding the dogs, watching television and playing video games. (R. at 281.) Ms. Jeffress noted that she took care of Plaintiff's hair and that she sometimes reminded Plaintiff to bathe. (R. at 282.) Ms. Jeffress indicated that Plaintiff "used to try to cook," but expected others to cook for him. (R. at 283.) She noted that Plaintiff did not " know how to talk to people appropriately," had trouble completing tasks, lost concentration and "did not follow instructions." (R. at 286.) Further, Ms. Jeffress indicated that Plaintiff "scream[ed] at the TV and videogames" and "sometimes g[o]t angry and" threw the controller. (R. at 285.) She wrote that Plaintiff was "unable to work because of [his] social skills and attitude." (R. at 288.) On the same date, Ms. Jeffress indicated on a work history document that Plaintiff was "smart but [his] illness [took] away from his capabilities to perform on jobs." (R. at 279.)

On October, 13, 2009, Mr. Harris completed a second Function Report and indicated that Plaintiff took care of his children by buying them things and took care of animals daily by feeding them. (R. at 29-91, 294, 300.) Mr. Harris also wrote that Plaintiff "used to have very good math skills." (R. at 295.) In response to a question asking whether Plaintiff had ever been

fired from a job, Mr. Harris noted that Plaintiff was fired as a result of his attitude, because he could not get along with another employee. (R. at 298.)

On a second Function Report dated April 10, 2010, Ms. Jeffress indicated that Plaintiff did not take care of any children, but that his children occasionally stayed overnight with him. (R. at 334.) Ms. Jeffress also marked that Plaintiff raked leaves and swept the floor. (R. at 336.)

**J.      Testimonial Evidence at the ALJ Hearings**

**1.      Hearing of March 3, 2011**

Plaintiff testified before the ALJ on March 3, 2011. (R. at 73.) Plaintiff stated that he did not graduate from high school and repeated some grades. (R. at 83.) He testified that during school, he got into "fights and stuff," "was fighting the police and things of that nature" and had thrown "a dog through [a] window." (R. at 84.) Plaintiff indicated that he sought help following these events and that his father took him "in to talk to people." (R. at 84-85.) He testified that his sister and father took him to appointments and filled out paperwork for him. (R. at 85.) Plaintiff stated that he was "not dumb." (R. at 88.) When asked whether he saw or heard things, Plaintiff answered that he did when things were wrong and that he wanted help. (R. at 89.)

Ms. Jeffress testified that Plaintiff had good and bad days and was sometimes suicidal. (R. at 92-93.) She noted that playing video games calmed Plaintiff down. (R. at 92-93.) Ms. Jeffress stated that she would not trust Plaintiff with small children, but recognized that "you can't really say, because some days he'll be real nice all day and then some days he's just there in a bad mood." (R. at 95.)

**2.      Supplemental Hearing of May 17, 2011**

On May 17, 2011, Ms. Jeffress testified at Plaintiff's supplemental hearing. (R. at 28, 56-57.) She recalled that Plaintiff had not received any mental health treatment in the last couple of years. (R. at 58.) Ms. Jeffress indicated that one of the incidents on Plaintiff's criminal record

14

involved drugs, but it was the result of Plaintiff being with the wrong people at the wrong time and Plaintiff taking the blame. (R. at 59.)

Medical examiner ("ME") Robert Muller, M.D., stated that there were several inconsistences in Dr. Cousins's report, such as the IQ score that he assigned to Plaintiff. (R. at 44.) The ME testified that he was "certainly not comfortable with" the IQ score because, if Plaintiff's IQ was truly 51, Plaintiff "wouldn't have been passing literacy tests at age 13 . . . wouldn't . . . be functioning on grade level through 13." (R at 43.) The ME opined that there was "really nothing to justify severe symptoms and limitations" and that Plaintiff was "capable of simple repetitive tasks in a non-stressful environment with limited interactions with the public." (R. at 43-44, 54.) The ME testified that Plaintiff had "more mild to moderate difficulty" with employment. (R. at 44.)

The ALJ then asked vocational expert ("VE") Patricia Verser a series of questions based on a hypothetical individual with the same age and same educational and vocational background as Plaintiff with no physical restrictions. (R. at 43-44.) The hypothetical individual would be restricted pursuant to the ME's testimony such that the individual would have "mild to moderate difficulties," but would be "capable of simple repetitive tasks in a non-stressful environment with limited interactions with the public." (R. at 43-44, 65.) The VE testified that, assuming these conditions, the individual would miss less than one day a month "over a six month period or year or years." (R. at 66.) The VE further testified that the individual would be capable of performing his past relevant work as a masonry laborer. (R. at 65-66.)

The ALJ asked the VE to assume a second hypothetical wherein the individual's psychological condition made it difficult for him to "perform even simple, non-repetitive work, simple one-two step types of jobs." (R. at 66-67.) The VE testified that, in that hypothetical, the

individual would be unable to perform any work whatsoever. (R. at 67.) The VE opined that an unskilled worker could perform his job with a 20% reduction in productivity, but any further reduction would have an impact on his ability to perform at an acceptable level. (R. at 68.)

## II. PROCEDURAL HISTORY

On May 16, 2008, Plaintiff filed an application for DIB and SSI alleging a mental disability that began on January 1, 2006. (R. at 204-16.) Due to the presence of certain risk factors, namely a lack of cooperation and inconsistent statements, the CDI was asked by DDS to examine Plaintiff's claim. (R. at 258.) Following this investigation, Plaintiff's claim was denied. (R. at 204-16.) On July 7, 2009, Plaintiff again filed for DIB and SSI, alleging that he was a "slow learner" and indicated an onset date of June 29, 2009. (R. at 219-28, 238.) The SSA denied this application initially and after reconsideration.[8] (R. at 123, 130.) On March 3, 2011, Plaintiff testified at a hearing before an ALJ. (R. at 73-108.) A supplemental hearing was held on May 17, 2011. (R. at 28-72.) On June 24, 2011, the ALJ denied Plaintiff's application, finding that he was not disabled under the Act, because, based on his age, education, work experience and RFC, Plaintiff could perform his previous job as a masonry laborer. (R. at 12-22.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (*See* R. at 1-3.)

## III. QUESTIONS PRESENTED

Did the Commissioner properly evaluate the credibility of the IQ test and was his evaluation supported with substantial evidence?

---

[8] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services (DDS), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

Did the Commissioner properly determine that Plaintiff's mental illnesses did not meet any Listing and was his determination supported with substantial evidence?

Did the Commissioner properly determine that Plaintiff was capable of performing his past relevant work and was his determination supported with substantial evidence?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).) Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted.) To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653.) In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).) The Commissioner's findings as to any fact – if the findings are supported by substantial evidence – are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted.) If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987.)

17

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177. The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA".)[9] 20 C.F.R. §§ 416.920(b), 404.1520(b.) If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c.) To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c.)

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

---

[9] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a.) Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b.) Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c.)

the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[10] based on an assessment of the claimant's RFC and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e.) If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted.)

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock*, 667 F.3d at 472-73; *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146, n.5.) The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989.) Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the

---

[10] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a.)

claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset date of his disability. (R. at 14.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of antisocial personality disorder and conduct disorder, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 17-19.) The ALJ next determined that Plaintiff had the RFC to perform work at all exertional levels, so long as the work was "restricted to simple repetitive routine tasks that d[id] not require frequent interaction with the public." (R. at 19-21.)

The ALJ then assessed at step four of the analysis that Plaintiff could perform his past relevant work as a masonry laborer, because such work did not require the activities precluded by Plaintiff's RFC. (R. at 21-22.) Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that he was not entitled to benefits under the Act. (R. at 21-22.)

In evaluating and weighing the evidence, the ALJ assessed Plaintiff's work and criminal history; medical records; the opinions of non-treating state agency psychologists; the opinions of consulting psychologists Drs. K. Russell, F. Russell and Cousins; the CDI reports; the testimony of Plaintiff, Ms. Jeffress, the VE and ME; and the function reports and summaries of Plaintiff's SSA interviews. (R. at 14-20.) The ALJ determined that Plaintiff and Ms. Jeffress were less than credible due to the inconsistencies in the information that they provided. (R. at 20.) The ALJ noted that the record lacked any evidence substantiating the severity of the disabilities that

20

Plaintiff claimed to have. (R. at 20.) Further, the ALJ assigned "no significant weight [to the] . . . assessment of Dr. Cousins" and found that the IQ score Dr. Cousins assigned to Plaintiff was "inconsistent with the other evidence of record, including [Plaintiff's] academic performance and level of adaptive functioning in adulthood." (R. at 16.)

Next, the ALJ indicated that Plaintiff's school records were inconsistent with mild mental retardation. (R. at 16.) Noting that Plaintiff was absent from school 70 days during a single school year, the ALJ explained that this volume of academic absences, not a decline in cognitive functioning, was the true cause of Plaintiff's poor performance. (R. at 16.) Perhaps most tellingly, the ALJ found no indication that Plaintiff had been in special education classes. (R. at 16.) Moreover, the ALJ summarized that Plaintiff passed various forms of reading, writing and intelligence testing while in school. (R. at 16.)

The ALJ also found Plaintiff's level of adaptive functioning to be inconsistent with mild mental retardation. (R. at 16.) The ALJ pointed to the August 2006 CDI report in which a witness indicated that Plaintiff shopped by himself regularly. (R. at 16.) According to the function reports, Plaintiff also lived alone, cared for his children, prepared simple meals and performed household chores. (R. at 16.) Further, the ALJ noted that Plaintiff had been gainfully employed in the past. (R. at 16.) The ALJ adopted the VE's testimony that indicated that Plaintiff's limitations did not preclude him from performing masonry work. (R. at 21.) The ALJ noted that the VE's testimony that "an inability to sustain a regular" workday or workweek "would preclude competitive employment." (R. at 21.) However, the ALJ assessed that the record did not establish that Plaintiff would be incapable of sustaining a regular workday or workweek and dismissed the testimony. (R. at 22.)

21

Finally, the ALJ noted Plaintiff's refusal to undergo intelligence testing by Dr. F. Russell and Dr. F. Russell's opinion that Plaintiff was malingering. (R. at 16.) This evidence, combined with the ME's testimony that Plaintiff's IQ score was suspicious, led the ALJ to conclude that Plaintiff's IQ score was invalid. (R. at 16.) The ALJ further concluded that "no 'severe' cognitive impairment [was] established by the evidence of record." (R. at 16.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law. (Pl.'s Mem. at 24.) Plaintiff argues that he is "mentally retarded" as defined at Listed Impairments 12.05(B), (C) or (D). Plaintiff argues in the alternative that he "cannot maintain attendance or consistently perform work activities" such that he would be unable to hold any position. (Pl.'s Mem. at 24.) The Commissioner argues in opposition that the ALJ's decision was supported by substantial evidence and the application of the correct legal standard such that it should be affirmed. (Def.'s Mot. for Summ. J. and Mem. in Sup. Thereof ("Def.'s Mem.") at 1.)

**A.     The ALJ's analysis of the validity of Plaintiff's IQ was supported by substantial evidence.**

Plaintiff contends that the ALJ erred, because he assigned no significant weight to the assessment of Dr. Cousins. (Pl.'s Mem. at 18.) The Commissioner argues that the ALJ properly weighed all of the evidence and appropriately concluded that Dr. Cousins's IQ test was inconsistent with the evidence in the record, including the ME's testimony. (Def.'s Mem. at 12.) The Commissioner offers several examples as support for the ALJ's credibility finding, including: Dr. F. Russell's report that Plaintiff was malingering, Plaintiff's school records, the inconsistency between Plaintiff's alleged handicap and his actual level of functioning, the fact that Plaintiff's children sometimes spent the night and the fact that Plaintiff shopped alone, performed household chores and prepared meals for himself. (Def.'s Mem. at 13.)

The ability to assess the validity of an IQ test is within the discretion of an ALJ, even if only one score exists in the record. *Hancock*, 667 F.3d at 474. The Court must determine "whether sufficient circumstances existed" to discredit the IQ test. *Id.* In this case, the ALJ determined that Plaintiff's statements were not credible and could not support his IQ score.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir.1997) ("Reviewing courts owe deference to factual findings, assessing them only to determine whether they are supported by substantial evidence."); *see also Hancock*, 667 F.3d at 476 ("We are not at liberty to 'reweigh conflicting evidence . . . or substitute our judgment for that of the [ALJ].'") (citation omitted). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir.1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir.1993)).

Substantial evidence supported the ALJ's analysis of the validity of Plaintiff's IQ test. Plaintiff's school records indicated that he was never in special education classes and he performed well academically until high school, when he missed 129 days of school. (R. at 268, 391, 394, 397.) Further, during the 10th grade, Plaintiff scored average or above average in 64 of 66 categories in a skills evaluation chart, including in the areas of reading comprehension, mathematics and written expression. (R. at 396.)

Plaintiff lived by himself, took care of himself, shopped alone, prepared simple meals, looked after dogs and performed household chores. (R. at 259, 403, 461, 464.) He also occasionally took care of his children overnight. (R. at 334)  Plaintiff previously had a driver's license. (R. at 259, 423.)  He had held several jobs and most recently worked as a masonry laborer. (R. at 232-33, 254, 287.)  Plaintiff was incarcerated on multiple occasions, but did not receive any kind of special treatment or mental health treatment during his incarcerations. (R. at 305.)

During a consultative examination with Dr. K. Russell, Plaintiff stated that he did not think he had a problem finding a job. (R. at 402.)  Dr. K. Russell noted that Plaintiff had a "history of physical fighting, destruction of physical property and lack of remorse." (R. at 403.) During this examination, Plaintiff stated that his inability to get along with co-workers was the reason that he no longer worked as a masonry laborer. (R. at 403.)  Plaintiff was uncooperative during this examination, so Dr. K. Russell could not perform an IQ test. (R. at 402-3.)

Dr. F. Russell found "good evidence for an individual malingering." (R. at 444.)  He opined that it was "unusual" that someone displaying the behavior that Plaintiff had would not have been in special education classes. (R. at 440.)  Similar to Dr. K. Russell, Dr. F. Russell was unable to perform an IQ test as a result of Plaintiff's uncooperativeness. (R. at 442-43.) Additionally, the ME testified that Dr. Cousin's IQ score was suspicious and that there were inconsistences in the report. (R. at 43-44.)  The ME asserted that Plaintiff would not have passed literacy tests or been on grade level through age 13 if his IQ score was truly 51. (R. at 43-44.)

The record indicated that Plaintiff did not suffer from a severe mental handicap while in school.  As the ALJ noted, Plaintiff provided contradictory answers to the consultative doctors. Further, the record contained evidence of malingering and no evidence of prior mental health

24

treatment.  Therefore, substantial evidence existed to support the conclusion of the ALJ that Dr. Cousin's IQ score was invalid.

**B.      Substantial evidence supported the ALJ's assessment that Plaintiff did not meet Listings 12.05(B), (C) or (D).**

Plaintiff asserts that he is mentally retarded and therefore disabled under Listings 12.05(B), (C) or (D).  (Pl.'s Mem. at 24.)  The burden to establish whether all criteria of a listing are satisfied rests on Plaintiff.  *Yuckert*, 482 U.S. at 146, n.5; 20 C.F.R. 404, subpt. P, app. 1, § 12.00(A) ("If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.").  To qualify as disabled under the listings, Plaintiff must first show that he meets the definition of mental retardation.  *Turnage v. Astrue*, No.  11-4071-JAR, 2012 WL 405590, at * 4 (D.  Kan.  Feb. 8, 2012); *Justice v. Barnhart*, 431 F. Supp. 2d 617, 619 (W.D. Va. 2006).  Mental retardation under all three Listings is defined as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.  In addition to proving that his mental retardation began before the age of 22, a claimant must then satisfy the additional criteria of each listing.  To do so, the claimant must demonstrate that he has:

> B.  A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1.  Marked restriction of activities of daily living; or
> > 2.  Marked difficulties in maintaining social functioning; or
> > 3.  Marked difficulties in maintaining concentration, persistence, or pace; or

25

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. 404, subpt. P, app. 1, §§ 12.05(B)-(D). Plaintiff need only meet one of these three Listings to be entitled to benefits.

First, Plaintiff's school and criminal records did not indicate that Plaintiff was mentally retarded before the age of 22, because Plaintiff was not enrolled in special education classes and was not segregated from the general population while incarcerated. *(See* R. at 259-60, 268, 305, 391, 394, 397.) Because Plaintiff cannot meet the definition of mental retardation under the Listings, he cannot be found disabled under the Act pursuant to the Listings.

Regardless, Plaintiff's argument fundamentally rests upon a valid IQ score in the range under the Listings. As substantial evidence supported the ALJ's determination that Plaintiff's IQ score was not credible, Plaintiff did not meet the criteria of Listing 12.05(B) as he did not have a "valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. 404, Subpart P, § 12.05(B), App. 1.

To support a determination that he qualifies under Listings 12.05(C) or (D), Plaintiff argues that "clearly, with some margin of error, [his IQ score] is between 60 and 70," because Plaintiff "flunked out of school" and had "to rely on his family to pay bills and to fill out paperwork for him." (Pl.'s Mem. at 21.) Following this logic, Plaintiff argues that he is disabled under Listings 12.05(C) or (D). (Pl.'s Mem. At 18-24.)

First, Plaintiff did not fail out of school, but rather was expelled for behavioral issues. (R. at 84, 462) Next, Plaintiff never established a valid IQ score in the range of 60-70. In fact, the record contains no valid IQ score whatsoever. Thus, Plaintiff did not meet his burden under the Listings. Accordingly, the ALJ's determination that Plaintiff's mental maladies did not meet the Listings was supported by substantial evidence.

26

**C.      Substantial evidence supported the ALJ's determination that Plaintiff could perform his past relevant work.**

Plaintiff argues that the ALJ failed "to consider the medical source statement that Plaintiff would unlikely be able to maintain regular attendance in the workplace or perform activities on [a] consistent basis and that he would be unable to maintain substantial gainful activity." (Pl.'s Mem. at 18.)  In support, Plaintiff points to the testimony of the VE that a productivity level below 80% would have an impact on an unskilled worker's ability to perform at an acceptable level.  (Pl.'s Mem. at 23.)  Plaintiff also notes Dr. F. Russell's statement that Plaintiff's "'behavior and demeanor during'" the evaluation indicated that Plaintiff would be "'unable to perform any kind of task, maintain any kind of attendance with regard to employment and perform work activities on a consistent basis,'" to which the VE testified that there was no work that such a person could perform.  (Pl.'s Mem. at 23-24.)

The Commissioner argues that the hypothetical posed by the ALJ accurately represented Plaintiff's RFC and, accordingly, the ALJ's determination was correct.  (Def.'s Mem. at 19.)  The Commissioner asserts that Plaintiff mischaracterized Dr. F. Russell's "findings by only quoting one portion of his report" and not quoting Dr. F. Russell's further finding "that there [w]as good evidence for an individual malingering."  (Def.'s Mem. at 18.)

At step four of the sequential analysis, the ALJ must assess the claimant's RFC and past relevant work to determine if the claimant is able to perform the tasks of his previous employment.  20 C.F.R. § 404.1520(a)(4)(iv).  The burden remains with Plaintiff at step four to prove that he is unable to perform his past relevant work.  Plaintiff must "show an inability to return to [his] previous work (*i.e.*, occupation), and not simply to [his] specific prior job."  *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983) (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981)).  The ALJ has discretion to frame the hypothetical question as he sees fit so

long as the question is supported by substantial evidence in the record. *Chavis v. Shalala*, 28 F.3d 1208 (4th Cir. 1992.)

Plaintiff's past relevant work was as a masonry laborer. (R. at 65, 232-33.) The VE testified that this type of work was unskilled and involved "very heavy physical demand level work." (R. at 65.) The ALJ posed a hypothetical question to the VE to consider an individual worker the same age and same educational and vocational background as Plaintiff with no physical limitations. (R. at 65.) The ALJ next instructed that the hypothetical individual would have "mild to moderate difficulties," but would be "capable of simple repetitive tasks in a non-stressful environment with limited interactions with the public." (R. at 43-44, 65.) The VE testified that the hypothetical individual would miss "less than one time a month" over a "six month period or year or years." (R. at 66.) The VE also testified that a productivity level below 80% would have an impact on an unskilled worker's ability to perform at an acceptable level. (R. at 68.)

The ALJ, as the finder of fact, weighed the evidence and determined that Plaintiff had the RFC to perform work at all exertional levels, so long as the work was "restricted to simple repetitive routine tasks that d[id] not require frequent interaction with the public." The ALJ did not find any evidence to support Plaintiff's contention that he would have a 20% reduction in productivity as a result of his maladies. Because the ALJ properly formulated a hypothetical to the VE that encompassed Plaintiff's RFC, the ALJ's determination that Plaintiff could perform his past relevant work as a masonry laborer was supported by substantial evidence.

## V. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 8 & 9) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/ _____

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:__August 21, 2012_____

29